**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FIDELITY AND GUARANTY INSURANCE COMPANY, and TRAVELERS PROPERTY AND CASUALTY COMPANY OF AMERICA, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. _____ |
| BRIGHT HAVEN BEHAVORIAL HEALTH CENTER, LTD., SAMIRA JIMENEZ, AND CLARITY CLINIC, LLC, | ) ) ) ) | |
| Defendants | | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs Fidelity and Guaranty Insurance Company ("FGIC") and Travelers Property and Casualty Company of America ("Travelers P&C"), for their Complaint for Declaratory Judgment against Defendants Bright Haven Behavioral Health Center, Ltd. ("Bright Haven"), Samira Jimenez ("Jimenez"), and Clarity Clinic, LLC ("Clarity"), allege as follows.

## NATURE OF THIS ACTION

1.      This is a declaratory judgment action pursuant to 28 U.S.C. §§2201 and 2202.

2.      Specifically, Plaintiffs seek a declaration that they have no obligation to defend or indemnify Defendants Bright Haven and Jimenez (collectively, "the Bright Haven Parties") against Defendant Clarity's underlying lawsuit (the "Lawsuit") because the insurance policies the Plaintiffs issued to Bright Haven, and under which the Bright Haven Parties seek coverage, do not provide coverage for the Lawsuit.

## PARTIES

3.      Plaintiff FGIC is an insurance company incorporated in Iowa and having its principal place of business in Hartford, Connecticut.  FGIC is, therefore, a citizen of Iowa and Connecticut.

4.      Plaintiff Travelers P&C is an insurance company incorporated in Connecticut and having its principal place of business in Hartford, Connecticut. Travelers P&C is, therefore, a citizen of Connecticut.

5.      Defendant Bright Haven is an Illinois corporation with its principal place of business in Illinois, and is, therefore, a citizen of Illinois.

6.      Defendant Jimenez is an individual who is domiciled in Illinois, and is, therefore, a citizen of Illinois

7.      Defendant Clarity is an Illinois limited liability company whose principal place of business is located in Chicago, Illinois.  After conducting a reasonable investigation and consulting public sources, including information disclosed by the Illinois Secretary of State, court files and other public records, Travelers has determined that the identity and citizenship of Clarity's members is not publically available.  However, based upon limited publically available information, as well as the allegations and exhibits of Clarity's pleadings in the Lawsuit, Plaintiffs are informed and believe that Clarity's members are domiciled in, and citizens of, Illinois, and not Iowa or Connecticut, and, therefore, that Clarity is a citizen of Illinois and is not a citizen of Iowa or Connecticut.  Clarity is included as a party in this action as a party potentially interested in the outcome in light of its pending claim against the Bright Haven Parties.

## JURISDICTION AND VENUE

8.      Federal subject matter jurisdiction exists in this action pursuant to

28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy

exceeds $75,000, exclusive of interest and costs.  Federal subject matter jurisdiction is also

invoked pursuant to the declaratory judgment provisions of 28 U.S.C. §§2201 and 2202.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391 because a

substantial part of the events giving rise to this action occurred in this district, the underlying

transactions between the Bright Haven Parties and Clarity occurred in this district, and the

insurance policies at issue were delivered to Bright Haven in this district.

## THE LAWSUIT

10.      On December 14, 2021, Clarity filed the Lawsuit against Bright Haven and

Jimenez, seeking injunctive relief and monetary damages, and alleging that the Bright Haven

Parties obtained and converted Clarity's confidential information with respect to its business in

providing clinical psychiatry and therapy services to patients throughout the greater Chicagoland

area.

11.      Clarity subsequently amended its complaint in the Lawsuit, adding other

defendants, and filed its Verified Second Amended Complaint for Injunctive and Other Relief

(the "Second Amended Complaint") on March 4, 2022. A true and correct copy of the Second

Amended Complaint is attached to this Complaint as **Exhibit A**.

12.      In the Second Amended Complaint, Clarity alleges that Jimenez, while employed

by Clarity, began working for Bright Haven and covertly sending to Bright Haven Clarity's

operational information and documents for Bright Haven to use to build a competing entity.

13.      Clarity alleges, in the Second Amended Complaint, that Jimenez' conversion of

and/or unauthorized access to, Clarity's confidential information, including without limitation,

patient health information protected by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), began in December 2020 and continued until, and after, the termination of Jimenez' employment with Clarity on September 14, 2021.

14.     Among other allegations of wrongful conduct by Jimenez and Bright Haven, Clarity alleges in the Second Amended Complaint that on December 20, 2020, while employed at Clarity, Jimenez exported - to her personal email address - a Clarity Clinic Google Business file folder containing over 9 gigabytes of confidential information, including patient health information protected by HIPPA, financial information, clinic process, and trade secrets belonging to Clarity (the "File"). (Ex. A, par. 8, 24(a)). Clarity alleges that Jimenez' actions in sending herself an email granting herself personal access to the File was for the purpose of helping to launch Bright Haven. (Ex. A., par. 67)

15.     Clarity further alleges, in the Second Amended Complaint, that as a result of exporting the File to her personal email address, Jimenez had access to a list of two of Clarity's physician providers' patients, including names, addresses and initial medical assessments, all of which is HIPPA protected information. (Ex. A, par. 24 (a)).

16.     In the Second Amended Complaint, Clarity further alleges that on January 15, 2021, Jimenez forwarded an email - from her Clarity email to a personal email address – regarding a HIPAA protected patient complaint. (Ex. A., par. 24(e)).

17.     Clarity also alleges in the Second Amended Complaint that on January 16, 2021, Jimenez forwarded an email - from her Clarity email to a personal address – containing HIPPA protected information about fraudulent documentation related to a patient of Clarity, and other information. (Ex. A, par 24(f)).

18.     Clarity alleges, in the Second Amended Complaint, that in January and February 2020, Jimenez sent confidential Clarity information by email to a Bright Haven email address, specifically sjimenez@brighthavenbhc.com.

19.     In the Second Amended Complaint, Clarity alleges that Jimenez continued to email from her Clarity email to herself and others, in April, May, June and September 2021, various documents and information related to Clarity's business for Bright Haven's use in connection with a competing business. (Ex. A, par. 24(g), (h), (i), (j), (k), (l), (m)).

20.     Clarity alleges that it terminated Jimenez' employment on September 14, 2021 and that it subsequently discovered her December 2020 unauthorized access to, and exporting of, the File, and that she sent the File to herself at that time, as well as the other unauthorized actions in accessing and converting Clarity information and documents as described in paragraphs 11 through 19 above.

21.     In the Lawsuit, Clarity asserts claims against the Bright Haven Parties for breach of fiduciary duties, conversion, violations of the Illinois Trade Secrets Act, tortious interference with business expectancy, and civil conspiracy.

22.     In the Lawsuit, Clarity seeks recovery from the Bright Haven Parties for, among other things, monetary damages resulting from their alleged conduct, including actual damages, punitive and exemplary damages, wage and separation pay that Clarity paid to Jimenez during the period in which she allegedly breached her duties, restitution/disgorgement of the value of patient information, disgorgement of all revenue allegedly earned through use of property misappropriated from Clarity, attorneys' fees and litigation expenses, and various forms of injunctive relief.

**THE FGIC POLICY**

23.     FGIC issued a Commercial Insurance Policy (Policy No. BIP-7S471695-21-42) to Bright Haven Behavioral Health with a Policy Period of September 22, 2021 through September 22, 2022 (the "FGIC Policy"). A true and correct copy of the FGIC Policy is attached to this Complaint as **Exhibit B**.

24.     The FGIC Policy includes several coverage parts, including CyberFirst Essentials Coverage Part ("Cyber Coverage"), Commercial General Liability Coverage Part ("CGL Coverage"), Property Coverage Part ("Property Coverage") and Employment Practices Liability Coverage Part ("EPL Coverage").[1]

**COUNT I**
**(DECLARATORY JUDGMENT – FGIC - CYBER COVERAGE)**

25.     Plaintiff FGIC realleges and incorporates the allegations contained in Paragraph 1 through 24 as if fully stated in this paragraph 25.

26.     Pursuant to the Cyber Coverage Part's **CYBERFIRST ESSENTIALS GENERAL PROVISIONS FORM (PR T1 13 02 12)**, the Cyber Coverage includes the following insuring agreement:

> **SECTION I - COVERAGE**
>
> **1.  Defense Of Claims Or Suits – Liability Coverages**
>
> > a.  We will have the right and duty to defend the insured against any "claim" or "suit" seeking "damages" for loss to which the insurance provided under one or more of "your cyber liability coverage forms" applies, if no provider of other insurance has a duty to defend the insured against that "claim" or "suit". However, we will have no duty to defend the insured

---

[1] On information and belief, the Bright Haven Parties do not seek coverage for the Lawsuit under the Property Coverage or the EPL Coverage, so neither of those coverages are addressed in this Complaint. In the event the Bright Haven Parties assert entitlement to coverage under those coverage parts, FGIC will amend the Complaint to demonstrate why no coverage is afforded for the Lawsuit under those coverage parts of the Policy, and reserves the right to contest any request for coverage under those parts.

against any "claim" or "suit" seeking "damages" for loss to which the insurance provided under "your cyber liability coverage forms" does not apply.

27. The **CYBERFIRST ESSENTIALS GENERAL PROVISIONS FORM (PR T1 13 02 12)** includes the following definitions, among others,:

5. "Claim" means a written demand that seeks "damages."

\* \* \*

8. "Damages":

a. Means a monetary amount paid to a claimant for loss.

b. Does not include:

(1) Credits.

(2) Voluntary payments.

(3) Amounts actually paid to you by your customer in exchange for products, services or work.

(4) An offset of fees, charges or commissions owed to you by your customer.

(5) Any fine or penalty imposed by law or regulation against the insured.

(6) The portion of any multiplied damage award that exceeds the amount multiplied.

(7) License fees or royalties of any kind.

(8) The amount of liquidated damages awarded pursuant to a contract or agreement that exceeds the amount of "damages" for which the insured would have liability in the absence of such contract or agreement.

(9) Fees, costs or expenses awarded pursuant to a prevailing party provision in a contract or agreement.

(10) Punitive damages, unless such damages are insurable under the applicable law.

\* \* \*

7

26. "Suit" means a civil proceeding that seeks "damages" or injunctive relief. "Suit" includes:

   a. An arbitration proceeding that seeks such "damages" or injunctive relief and to which the insured must submit or submits with our consent; and

   b. Any other alternative dispute resolution proceeding that seeks such "damages" or injunctive relief and to which the insured submits with our consent.

* * *

30. "Wrongful act" means any of the following:

   a. "Information security wrongful act", if the CyberFirst Essentials Information Security Liability Coverage Form is part of your policy.

   b. "Errors and omissions wrongful act", if the CyberFirst Essentials Technology Products Or Services Errors And Omissions Liability Coverage Form is part of your policy.

* * *

32. "Your CyberFirst coverage forms" means the coverage forms that you have purchased, as shown in the Declarations of this Coverage Part.

28.   Pursuant to the **CYBERFIRST ESSENTIALS INFORMATION SECURITY LIABILITY COVERAGE FORM (PR T1 14 02 12)**, the Cyber Coverage Part further includes the following insuring agreement:

### SECTION I – INFORMATION SECURITY LIABILITY COVERAGE

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as "damages" because of loss to which this insurance applies. The amount we will pay for "damages" is limited as described in Section **III** - Limits Of Insurance in your CyberFirst Essentials General Provisions Form.

   b. This insurance applies to loss only if:

      (1) The loss is caused by an "information security wrongful act" committed in the "coverage territory";

8

(2) The "information security wrongful act" was committed on or after the Information Security Retroactive Date shown in the Declarations of this Coverage Part and before the end of the policy period; and

(3) A "claim" or "suit" that seeks "damages" because of the loss is first made or brought against any insured, in accordance with Paragraph e. below, during the policy period or any Extended Reporting Period we provide under Section VI - Extended Reporting Periods in your CyberFirst General Provisions Form.

c. Each "information security wrongful act" in a series of "related information security wrongful acts" will be deemed to have been committed on the date the first wrongful act in that series is committed.

29. The **CYBERFIRST ESSENTIALS INFORMATION SECURITY LIABILITY COVERAGE FORM (PR T1 14 02 12)** includes the following definitions, among others:

> **SECTION II – DEFINITIONS**
>
> \* \* \*
>
> 3. "Identity information" means any of the following information concerning a person:
>
>     a. Nonpublic personal information as defined in the Gramm-Leach Bliley Act of 1999, or any of its amendments, or any regulation issued pursuant to such Act;
>
>     b. Medical or health care information, including protected health information as defined in the Health Insurance Portability and Accountability Act of 1996, or any of its amendments, or any regulation issued pursuant to such Act;
>
>     c. Personal information that is protected from unauthorized access or acquisition under any other local, state, federal or foreign law or regulation; or
>
>     d. A driver's license or state identification number; social security number; unpublished telephone number; or credit, debit or charge card number, or other financial account number and any security code, access code, password or PIN number associated with such credit, debit or charge card number or other financial account number.
>
> 4. "Information security wrongful act" means any of the following committed by or on behalf of an insured in the conduct of your business:

a. Failure to prevent unauthorized access to, or use of, "identity information" of others; or

b. Failure to provide notification of any actual or potential unauthorized access to, or use of, "identity information" of others as required by any "security breach notification law" that applies to you.

\* \* \*

6. "Related information security wrongful acts" means two or more "information security wrongful acts" that have a common connection, tie, or link any fact, circumstance, situation, event, transaction, cause, or series of related facts, circumstances, situations, events, transactions or causes.

7. "Security breach notification law" means any law or regulation that requires an organization to notify persons that their nonpublic personal information was or may have been accessed or acquired without their authorization.

30. The **CYBERFIRST ESSENTIALS GENERAL PROVISIONS FORM (PR T1 13 02 12)** includes the following exclusions, among others, providing that the insurance provided under Cyber Coverage does not apply to:

e. **Criminal, Dishonest, Fraudulent, Or Malicious Wrongful Acts Or Knowing Violations Of Rights Or Laws**

Loss arising out of any criminal, dishonest, fraudulent, or malicious "wrongful act", or any knowing violation of rights or laws, committed:

1. By the insured; or

2. With the consent or knowledge of the insured.

This exclusion does not apply to our duty to defend that insured until it has been determined or admitted in a legal proceeding that such "wrongful act" or knowing violation was committed:

**(1)** By the insured; or

**(2)** With the consent or knowledge of that insured.

\* \* \*

**j. Injunctive Relief**

Any loss, cost or expense arising out of complying with any injunctive or other non-monetary relief or any agreement to provide such relief.

**k. Known Wrongful Acts**

Loss arising out of any "wrongful act", including any part of "related wrongful acts", that any "described authorized person" knew about before the first date we or any of our affiliated insurance companies have continuously provided this or similar coverage to you.

31. The **CYBERFIRST ESSENTIALS INFORMATION SECURITY LIABILITY COVERAGE FORM (PR T1 14 02 12)** includes the following exclusions, among others, providing that the insurance provided under this form does not apply to:

**c. Intellectual Property**

Loss arising out of any actual or alleged infringement or violation of any of the following rights or laws committed by or on behalf of an insured:

(1) Copyright;
(2) Patent;
(3) Trade dress;
(4) Trade name;
(5) Trade secret;
(6) Trademark; or
(7) Other intellectual property rights or laws.

**d. Profits**

Disgorgement of profits, accounting or award of profits, or any other return of profits.

* * *

32. Subject to the FGIC Policy's other terms and conditions, the FGIC Policy's Information Security Liability Coverage  may apply to loss only if, among other things, the loss is caused by an "information security wrongful act" committed on or after the Information Security Retroactive Date set forth in the FGIC Policy's Declarations, i.e. September 15, 2021.

33.     Pursuant to the FGIC Policy's Information Security Liability Coverage part Insuring Agreement, each "information security wrongful act" in a series of "related information security wrongful acts" will be deemed to have been committed on the date the first wrongful act in that series is committed.

34.     In the Second Amended Complaint, Clarity alleges wrongful conduct by Bright Haven and Jimenez beginning in December 2020 and continuing through December 2021.

35.     To the extent that the wrongful conduct alleged in the Second Amended Complaint constitutes "information security wrongful acts", as defined in the FGIC Policy, such wrongful acts constitute "related information security wrongful acts" and are deemed to have been committed on the date the first wrongful act in that series was committed.

36.     To the extent that the wrongful conduct alleged in the Second Amended Complaint constitutes "information security wrongful acts", as defined in the FGIC Policy, the first "information security wrongful act" alleged in the Second Amended Complaint in the Lawsuit is alleged to have been committed before the Policy's September 15, 2021 Information Security Retroactive Date, and all "information security wrongful acts" alleged in the Second Amended Complaint are, therefore, deemed to have been committed before the FGIC Policy's September 15, 2021 Information Security Retroactive Date.

37.     Because any alleged "information security wrongful acts" asserted in the Lawsuit are deemed to have been committed before the applicable retroactive date, the FGIC Policy's Cyber Coverage does not apply the Lawsuit.

38.     Coverage under the FGIC Policy's Cyber Coverage Part is also barred, in whole or in part, by the application of the Cyber Coverage Part's exclusions, referenced in paragraphs 30 and 31 of this Count I, to the extent that the Lawsuit is for:

a. Loss arising out of criminal, dishonest, fraudulent or malicious "wrongful act", or any knowing violation of rights or laws, committee by the insured or with the consent or knowledge of the insured;

b. Loss, cost or expense arising out of complying with any injunctive or other non-monetary relief or any agreement to provide such relief;

c. Loss arising out of any "wrongful act", including any part of "related wrongful acts", that any "described authorized person" knew about before the first date FGIC or any of its affiliated insurance companies have continuously provided coverage to Bright Haven;

d. Loss arising out of any actual or alleged infringement or violation of intellectual property rights or laws, including, without limitation, trade secret rights or laws; or

e. Disgorgement of profits, accounting or award of profits, or any other return of profits.

39. FGIC is entitled to a declaration that it has no duty to defend or indemnify the Bright Haven Parties, under the Policy's Cyber Coverage Part, in connection with the Lawsuit.

WHEREFORE, Plaintiff Fidelity and Guarantee Insurance Company respectfully requests that the Court adjudicate and declare the rights and obligations of the parties, and that the Court:

a) Declare that Plaintiff Fidelity and Guaranty Insurance Company has no obligation under the FGIC Policy to defend or indemnify Bright Haven and Jimenez against the Lawsuit; and

b) Grant such other and further relief as this Court deems proper.

## COUNT II
## (DECLARATORY JUDGMENT – FGIC - CGL COVERAGE)

40. FGIC realleges and incorporates the allegations contained in Paragraph 1 through 24 as if fully stated in this paragraph 40.

41.     Pursuant to the FGIC Policy's CGL Coverage Part's **COMMERCIAL GENERAL LIABILITY COVERAGE FORM (CG T1 01 02 19)**, the CGL Coverage Part includes the following insuring agreements:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.  Insuring Agreement**

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

b.  This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period;

* * *

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.  Insuring Agreement**

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.

b.  This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

14

\* \* \*

42. The FGIC Policy's **COMMERCIAL GENERAL LIABILITY COVERAGE FORM (CG T1 01 02 19)** includes the following definitions, among others:

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material places on the Internet or on similar electronic means of communication; and

   b. Regarding websites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Advertising injury":

   a. Means injury caused by one or more of the following offenses:

      (1) Oral or written publication, including publication by electronic means, of material in your "advertisement" that slanders or libels a person or organization or disparages a person's or organization's goods, products or services, provided that the claim is made or the "suit" is brought by a person or organization that claims to have been slandered or libeled, or that claims to have had its goods, products or services disparaged;

      (2) Oral or written publication, including publication by electronic means, of material in your "advertisement" that:

         (a) Appropriates a person's name, voice, photograph or likeness; or

         (b) Unreasonably places a person in a false light; or

      (3) Infringement of copyright, "title" or "slogan" in your "advertisement", provided that the claim is made or the "suit" is brought by a person or organization that claims ownership of such copyright, "title" or "slogan".

   b. Includes bodily injury caused by one or more of the offenses described in Paragraph a. above.

\* \* \*

15

4.  "Bodily injury "means:

    a.  Physical harm, including sickness or disease, sustained by a person; or

    b.  Mental anguish, injury or illness, or emotional distress, resulting at any time from such physical harm, sickness or disease.

    \* \* \*

17. "Occurrence" means:

    a.  An accident, including continuous or repeated exposure to substantially the same general harmful conditions; or...

    \* \* \*

18. "Personal and advertising injury" means "personal injury" or "advertising injury".

19. "Personal injury":

    a.  Means injury, other than "advertising injury", caused by one or more of the following offenses:

        (1) False arrest, detention or imprisonment;

        (2) Malicious prosecution;

        (3) The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, provided that the wrongful eviction, wrongful entry or invasion of the right of private occupancy is committed by or on behalf of the owner, landlord or lessor of that room, dwelling or premises;

        (4) Oral or written publication, including publication by electronic means, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services, provided that the claim is made or the "suit" is brought by a person or organization that claims to have been slandered or libeled, or that claims to have had its goods, products or services disparaged; or

        (5) Oral or written publication, including publication by electronic means, of material that:

            (a) Appropriates a person's name, voice, photograph or likeness; or

            (b) Unreasonably places a person in a false light.

16

    b.   Includes "bodily injury" caused by one or more of the offenses described in Paragraph a. above

* * *

23. "Property damage" means:

    a.   Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it; or

    b.   Loss of use of tangible property that is not physically injured. All such loss of use will be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, "electronic data" is not tangible property.

* * *

43.    Coverage A of the FGIC Policy's CGL Coverage Part does not apply to the Lawsuit because the Lawsuit is not a suit seeking damages because of "bodily injury" or "property damage" caused by an "occurrence", as those terms are defined in the FGIC Policy, and the Lawsuit therefore does not meet the requirements of the Coverage A Insuring Agreement.

44.    If the Lawsuit satisfied the requirements of the FGIC Policy's Coverage A Insuring Agreement, which FGIC expressly denies, Coverage A of the CGL Coverage Part would not provide coverage for the Lawsuit because the following FGIC Policy Exclusion applies to the Lawsuit:

**2.  Exclusions.**

This insurance does not apply to:

**r.  Access Or Disclosure of Confidential or Personal Information**

"Bodily Injury" or "property damage" arising out of any access to or disclosure of any person's or organization's confidential or personal information.

17

45.     Coverage B of the FGIC Policy's CGL Coverage Part does not apply to the Lawsuit because the Lawsuit is not a suit seeking damages because of "personal injury" or "advertising injury", as those terms are defined in the FGIC Policy, and the Lawsuit therefore does not meet the requirements of the Coverage B Insuring Agreement.

46.     If the Lawsuit satisfied the requirements of the FGIC Policy's Coverage B Insuring Agreement, which FGIC expressly denies, Coverage B of the CGL Coverage Part would not provide coverage for the Lawsuit because one or more of the following FGIC Policy Exclusions apply to the Lawsuit, in whole or in part:

2. **Exclusions.**

This insurance does not apply to:

a. **Knowing Violation of Rights of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

* * *

i. **Intellectual Property**

"Personal and advertising injury" arising out of any actual or alleged infringement or violation of any of the following rights or laws, or any other "personal and advertising injury" alleged in any claim or "suit" that also alleges any such infringement or violation:

(1) Copyright;

(2) Patent;

(3) Trade dress;

(4) Trade name;

(5) Trademark;

(6) Trade secret; or

(7) Other intellectual property rights or laws.

18

This exclusion does not apply to:

(1) "Advertising injury" arising out of any actual or alleged infringement or violation of another's copyright, "title" or "slogan" in your "advertisement"; or

(2) Any other "personal and advertising injury" alleged in any claim or "suit" that also alleges any such infringement or violation of another's copyright, "title" or "slogan" in your "advertisement".

\* \* \*

**q. Access Or Disclosure of Confidential or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information.

\* \* \*

47.    FGIC is entitled to a declaration that it has no obligation to defend or indemnify the Bright Haven Parties, under the FGIC Policy's CGL Coverage Part, in connection with the Lawsuit.

WHEREFORE, Plaintiff Fidelity and Guaranty Insurance Company respectfully requests that the Court adjudicate and declare the rights and obligations of the parties, and that the Court:

a)  Declare that Plaintiff Fidelity and Guaranty Insurance Company has no obligation under the FGIC Policy to defend or indemnify Bright Haven and Jimenez against the Lawsuit; and

b)  Grant such other and further relief as this Court deems proper.

**COUNT III**
**(DECLARATORY JUDGMENT – TRAVELERS P&C –**
**EXCESS & UMBRELLA COVERAGE)**

48.    Plaintiff Travelers P&C realleges and incorporates the allegations contained in Paragraph 40 through 47 of this Complaint, as if fully stated in this paragraph 48.

49.     Travelers P&C issued an Excess Follow-Form and Umbrella Liability Insurance Policy (Policy No. CUP-7S71211-21-42) to Bright Haven Behavioral Health with a Policy Period of September 22, 2021 through September 22, 2022 (the "Travelers Policy"). A true and correct copy of the Travelers Policy is attached to this Complaint as **Exhibit C.**

50.     In the Travelers Policy's Schedule of Underlying Insurance, the Travelers Policy identifies the FGIC Policy as Underlying Insurance with respect to CGL Coverage.

51.     The Travelers Policy provides three types of coverage: excess liability coverage (Coverage A), umbrella liability coverage (Coverage B), and crisis management services expense (Coverage C).[2]

52.     The Travelers Policy includes the following insuring agreement, in relevant part, with respect to excess liability coverage (form EU 00 01 07 16):

### A. COVERAGE A – EXCESS FOLLOW-FORM LIABILITY

1.  We will pay on behalf of the insured those sums, in excess of the "applicable underlying limit", that the insured becomes legally obligated to pay as damages to which Coverage A of this insurance applies, provided that the "underlying insurance" would apply to such damages but for the exhaustion of its applicable limits of insurance. If a sublimit is specified in any "underlying insurance", Coverage A of this insurance applies to damages that are in excess of that sublimit only if such sublimit is shown for that "underlying insurance" in the Schedule Of Underlying Insurance.

* * *

53.     Pursuant to the Travelers Policy's Coverage A insuring agreement, the Travelers Policy provides coverage only if, among other things, the "underlying insurance" would apply to

---

[2] Coverage C has no potential application to the Lawsuit, and the Bright Haven Parties do not seek coverage under Coverage C, so it is not addressed here.

the damages for which the insured becomes legally obligated to pay, and only for covered damages that exceed the applicable limits of liability of the "underlying insurance".

54. The Travelers Policy's Coverage A does not apply to the Lawsuit because, among other reasons, the "underlying insurance" (i.e. the FGIC Policy) does not apply to the damages sought in the Lawsuit, and the limits of liability of the FGIC Policy have not been exhausted.

55. The Travelers Policy's Coverage B insuring agreement provides as follows, in relevant part, with respect to umbrella liability coverage (form EU 00 01 07 16):

B.  COVERAGE B – UMBRELLA LIABILITY

1.  We will pay on behalf of the insured those sums in excess of the "self-insured retention" that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which Coverage **B** of this insurance applies.

2.  Coverage **B** of this insurance applies to "bodily injury" or "property damage" only if:

    a.  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place anywhere in the world;

    b.  The "bodily injury" or "property damage" occurs during the policy period; and

    c.  Prior to the policy period, no insured listed under Paragraph 1. in Paragraph **B., COVERAGE B – UMBRELLA LIABILITY, of SECTION II – WHO IS AN INSURED** and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, in whole or in part, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

3.  Coverage **B** of this insurance applies to "personal injury" or "advertising Injury" caused by an offense arising out of your business, but only if the offense was committed during the policy period anywhere in the world.

* * *

56.     The Travelers Policy's Coverage B does not apply to the Lawsuit because, among other reasons, the Lawsuit is not a suit seeking damages because of "bodily injury", "property damage", "personal injury" or "advertising injury"  caused by an "occurrence", as those terms are defined in the Travelers Policy.

57.     If the Lawsuit satisfied the requirements of the Travelers Policy's Coverage B Insuring Agreement, which Travelers P&C expressly denies, the Travelers Policy would not provide coverage for the Lawsuit to the extent that the following Travelers Policy Exclusions apply to the Lawsuit, in whole or in part:

16.     **Knowing Violation Of Rights Of Another** "Personal injury" or "advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal injury" or "advertising injury".

* * *

23.     **Intellectual Property**

"Personal injury" or "advertising injury" arising out of any actual or alleged infringement or violation of any of the following rights or laws, or any other "personal injury" or "advertising injury" alleged in any claim or "suit" that also alleges any such infringement or violation:

**a**.     Copyright;

**b**.     Patent;

**c**.     Trade dress;

**d**.     Trade name;

**e**.     Trademark;

**f**.     Trade secret; or

**g**.     Other intellectual property rights or laws.

This exclusion does not apply to:

**a.** "Advertising injury" arising out of any actual or alleged infringement or violation of another's copyright, "title" or "slogan" in your "advertisement"; or

**b.** Any other "personal injury" or "advertising injury" alleged in any claim or "suit" that also alleges any such infringement or violation of another's copyright, "title" or "slogan" in your "advertisement".

\* \* \*

58. Travelers P&C is entitled to a declaration that it has no obligation to defend or indemnify the Bright Haven Parties, under the Travelers Policy, in connection with the Lawsuit.

WHEREFORE, Plaintiff Travelers Property and Casualty Company of America respectfully requests that the Court adjudicate and declare the rights and obligations of the parties, and that the Court:

b) Declare that Plaintiff Travelers Property and Casualty Company of America has no obligation under the Travelers Policy to defend or indemnify Bright Haven and Jimenez against the Lawsuit; and

b) Grant such other and further relief as this Court deems proper.

FIDELITY AND GUARANTY INSURANCE COMPANY, and TRAVELERS PROPERTY AND CASUALTY COMPANY OF AMERICA

By: */s/ Christopher J. Bannon*
Christopher J. Bannon
Samuel R. Leist
Aronberg Goldgehn Davis & Garmisa
330 North Wabash Avenue, Suite 1700
Chicago, IL 60611
Ph: (312) 755-3175
Fax: (312) 222-6375
cbannon@agdglaw.com
sleist@agdglaw.com

*Attorneys for Plaintiffs Fidelity Guaranty Insurance Company and Travelers Property and Casualty Company of America*

4867-2153-4238, v. 1